## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| ———————————————— ) | |
| SGS NORTH AMERICA, INC.                ) | Civil Action No. <u>2:20-cv-00216</u> |
| ) | |
| Plaintiff,          ) | |
| ) | **COMPLAINT** |
| v.                              ) | |
| ) | |
| ERP ENVIRONMENTAL FUND, INC.,        ) | |
| PHOENIX FEDERAL NO 2 MINING, LLC,    ) | |
| and CLARKE INVESTMENTS, LLC          ) | |
| ) | |
| Defendants.         ) | |
| ———————————————— ) | |

### NATURE OF THE CASE

Plaintiff SGS North America, Inc. ("SGS") brings this action for breach of contract, quantum meruit, unjust enrichment, and account stated against ERP Environmental Fund, Inc. ("ERP"), Phoenix Federal No 2 Mining, LLC ("Phoenix Federal"), and Clarke Investments, LLC ("Clarke Investments"), (collectively, "Defendants") through undersigned counsel, and alleges as follows:

### PARTIES

1.      Plaintiff SGS is a worldwide leader in testing, inspection, verification, and certification services.  It is now, and at all times referenced herein, a corporation organized and authorized to transact business under the laws of the State of New Jersey, with its principal place of business located in New Jersey.

2.      Defendant ERP Environmental Fund, Inc. is now, and at all times referenced herein, organized and authorized to transact business under the laws of the State of West Virginia, with its principal place of business located in Virginia.

1

3.      Defendant Phoenix Federal No 2 Mining, LLC is now, and at all times referenced herein, organized and authorized to transact business under the laws of the State of West Virginia, with its principal place of business located in West Virginia.

4.      Defendant Clarke Investments, LLC is organized and authorized to transact business under the laws of the State of Virginia, with its principal place of business located in Virginia.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332 because Plaintiff SGS is a citizen of a state that is separate and different from the state of citizenship of each and every Defendant.

6.      As set forth below and incorporated herein, the amount in controversy requirements of 28 U.S.C. § 1332 are satisfied because there is more than $75,000.00 at issue, exclusive of costs and interest.

7.      This action properly lies in the Southern District of West Virginia pursuant to 28 U.S.C. § 1391 because the facts giving rise to this lawsuit occurred predominantly in this District and because at all times relevant to this action, the Defendants were subject to personal jurisdiction in this District.

## STATEMENT OF FACTS

**A.  Background on Clarke Investments**

8.      Upon information and belief, through a complicated web of subsidiaries and affiliated companies, Clarke Investments pursues a strategy of purchasing coal mining assets out of bankruptcy for the sole benefit, use, and potential profit of Clarke Investments.

9.      Thomas Clarke ("Mr. Clarke"), a Virginia businessman, is the eponymous Chief Executive Officer of Clarke Investments, and upon information and belief, is either an executive

officer and/or director of the various Clarke Investments subsidiaries and affiliates.  Upon information and belief, ERP is a wholly owned subsidiary or corporate related affiliate of Clarke Investments.

10.     Indeed, Mr. Clarke is a corporate officer of Defendant ERP and in a 2016 submission to the U.S. Nuclear Regulatory Commission, Mr. Clarke identified himself as the president and chief executive officer of ERP.

11.     Further, ERP's corporate registration filing in the State of West Virginia identifies Mr. Clarke as a corporate officer of ERP and notes ERP's corporate affiliation with several other Clarke Investment companies, including Kissito Healthcare, Inc. and VCLF Land Trust, Inc.

12.     Upon information and belief, prior to entering the coal mining business, Mr. Clarke operated numerous nursing homes through his entity entitled Kissito Healthcare.

**B.  SGS's Business Relationship with Defendants**

13.     For many years, SGS had performed professional environmental monitoring services for Peabody Energy at locations adjacent to its coal mining operations in West Virginia. SGS and Peabody Energy entered into a formal contract governing these services.

14.     More specifically, on a monthly basis, SGS employees would investigate environmental conditions near specified coal mine locations, collect samples, and analyze the samples for the presence of certain analytes.  SGS would also provide the data to the West Virginia Department of Environmental Protection ("WV DEP") pursuant to applicable regulations and Peabody Energy coal mine permit requirements (hereinafter, SGS's professional services are collectively referred to as "coal mine monitoring services").

15.     Upon information and belief, Peabody Energy spun off the majority of its Eastern U.S. operations into Patriot Coal Corporation ("Patriot Coal"), and SGS continued to perform the

coal mine monitoring services for Patriot Coal at the same locations it had previously conducted this work for Peabody Energy. SGS and Patriot Coal entered into a formal contract governing these services.

16.     Upon information and belief, Patriot Coal filed Chapter 11 Bankruptcy Reorganization, which was approved in 2015. Upon information and belief, on October 27, 2015, the bankruptcy judge approved the finalization of an asset purchase agreement between Patriot Coal and Virginia Conservation Legacy Fund, Inc., which, upon information and belief, is a Clarke Investments subsidiary that has publicly identified Mr. Clarke as the president and a director.

17.     From the inception of SGS's business relationship with Defendants, Mr. Clarke and Clarke Investments has been intimately involved: On or about October 22, 2015, Patriot Coal contacted numerous vendors, including SGS, to arrange for the continuation of professional services at its purchased properties. In addition to notifying SGS that it should continue performing coal mine monitoring services for ERP Federal Mining Complex, LLC (another Clarke Investments company), Patriot Coal explicitly explained that SGS should continue performing coal mine monitoring services at the former Patriot Coal properties that Defendant ERP acquired. Crucially, the communication identified Mr. Clarke as Defendant ERP's Chief Financial Officer. *See* Exhibit A (October 22, 2015 email from Bill Runyon).

18.     Several days later on or about October 25, 2015, Clarke Investments sent SGS a letter of introduction, which stated that "ERP Environmental Fund, Inc. is the compliance and reclamation division of ERP Compliant Fuels, Inc., a partnership between Virginia Conservation Legacy Fund, Inc. and IRON Management, LLC," all Clarke Investments entities on information and belief. The letter asked that SGS continue with "water testing/monitoring" at specified

locations previously owned by Patriot Coal.  Notably, Tom Clarke is copied on this e-mail communication as a recipient.  Further, although the communication ostensibly comes from ERP and Virginia Conservation Legacy Fund, the individual transmitting the e-mail communication has a "kissito.org" e-mail address, which, as noted above, is another Tom Clarke entity.  *See* Exhibit B (October 25, 2015 letter from Jennifer Bell).

19.     Thus, in or about October 2015, SGS, on the one hand, and ERP and Clarke Investments, on the other hand, entered into a contract for SGS to perform coal mine monitoring services and thereafter in or about November 2015, SGS began performing coal mine monitoring services for ERP and Clarke Investments (hereinafter, collectively referred to as the "ERP Defendants") at the same locations it had previously monitored for Peabody Energy and Patriot Coal pursuant to Clarke Investments' specific requests.

20.     Likewise, upon information and belief, in or about May 2018, Clarke Investments subsidiary ERP Federal Mining No. 2, LLC sold certain West Virginia coal mine assets to Phoenix Federal where SGS had been performing coal mine monitoring services for Clarke Investments and its subsidiary.  Upon information and belief, Clarke Investments specifically requested that SGS continue performing coal mine monitoring services at the same locations for Phoenix Federal as SGS had been doing prior to the asset sale.

21.     Thus, in or about May 2018, SGS, on the one hand, and Phoenix Federal and Clarke Investments, on the other hand, entered into a contract for SGS to perform coal mine monitoring services and SGS thereafter began performing coal mine monitoring services for Phoenix Federal and Clarke Investments (hereinafter, collectively referred to the "Phoenix Federal Defendants") at the same locations it had previously monitored prior to the asset sale.

22.     Upon information and belief, although the aforementioned coal mine assets were sold to Phoenix Federal, Clarke Investments remained responsible for compliance with certain environmental monitoring and data reporting requirements since it was still the permittee of these coal mines.  This is the reason, upon information and belief, Clarke Investments and Phoenix Federal entered into a contract with SGS for SGS to continue performing coal mine monitoring services at these locations.

23.     Accordingly, from approximately November 2015 to December 2019, SGS performed coal mine monitoring services for Defendants in West Virginia.  SGS would investigate environmental conditions near the specified coal mine locations, collect samples, analyze the collected samples, and report the resulting data to the WV DEP.

24.     Defendants were cognizant of SGS performing the coal mine monitoring services and understood that SGS expected remuneration for the professional services rendered.  Indeed, although Defendants were slow to pay SGS's invoices, Defendants eventually paid all of SGS's billed invoices without objection dated November 2015 through January 2019.

25.     At times when Defendants' accounts were in extreme arrears, SGS would threaten to stop performing further coal mine monitoring services and Defendants would pay at least a portion of the arrearages.

26.     For example, in or about August 2018, SGS notified Defendants that their accounts were being turned over to collections and that SGS would not upload any data to the regulatory agencies' online portal until SGS received a $400,000 payment on outstanding invoices.

27.     Similarly, in November 2018, Clarke Investments arranged for a wire transfer to SGS on the Phoenix Federal Defendants' account to ensure that SGS continued performing coal

mine monitoring services after the Phoenix Federal Defendants had accrued several months of arrearages.

28.     On or about January 18, 2019, Clarke Investments contacted SGS to confirm the submission of a wire payment on behalf of the Phoenix Federal Defendants "in exchange for the release of data that is due Sunday 1/20/19."  The correspondence also stated that either ERP or Phoenix Federal would make additional payments in the following week to release additional data.  *See* Exhibit C (January 18, 2019 email from Lauren Etschmaier).

29.     Similarly, on January 25, 2019, Clark Investments contacted SGS to confirm another wire payment on behalf of the Phoenix Federal Defendants.  After confirming the wire payment, Clarke Investments requested information regarding continued coal mine monitoring services and specifically authorized SGS to increase scope of its work.

## C. Defendants' Failure to Pay SGS's Invoices

30.     Defendants' last payment to SGS was for coal mine monitoring services performed through December 2018 and February 2019 for the ERP Defendants and Phoenix Federal Defendants, respectively.  Defendants have refused to remunerate SGS for the significant amount of coal mine monitoring services it subsequently performed despite repeated demands for payment.

31.     In or about June 2019, SGS informed defendants that coal mine monitoring services would halt without the payment of outstanding invoices.

32.     In or about July 2019, SGS notified Defendants that it had removed its sample collectors from the field and would stop reporting sampling data to the regulatory authorities.  Clarke Investments responded that "we simply don't have those funds available" and asked about releasing data "for less money at this time with a firm agreement to pay these amounts

7

once the sales complete?  We are happy to assign these sales to SGS directly to ensure the amount owed is paid."  *See* Exhibit D (July 16, 2019 email from Lauren Etschmaier).

33.    In August 2019, Clarke Investments wired a payment to SGS to pay open Phoenix Federal Defendant invoices to allow SGS to resume performing coal mine monitoring services. *See* Exhibit E (August 2, 2019 email from Lauren Etschmaier).

34.    Later that month, in connection with renewing its permits at the coal mines Clarke Investments had sold to Phoenix Federal, Clarke Investments sent permit renewal documents to SGS and specifically requested that SGS perform the requisite sampling in support of Clarke Investments' permit renewal application since Clarke Investments was still the permittee at these mines.  *See* Exhibit F (August 5, 2019 email from Lauren Etschmaier).  Upon information and belief, as noted above, Clarke Investments' status as a permittee of these coal mines is one of the primary reasons Clarke Investments and Phoenix Federal contracted with SGS to perform the coal mine monitoring services at these particular coal mines.

35.    Further, the ERP Defendants made a payment to SGS in August 2019 on a portion of the ERP Defendants' arrearages in an effort to convince SGS to resume performing the coal mine monitoring services.

36.    Thereafter in September 2019, Defendants failed to continue making payments on the remainder of the outstanding invoices and SGS removed its samplers from the field.

**D.  SGS's Ongoing Efforts to Collect Payment from Defendants**

37.    In or about September 2019, SGS gave Defendants notice of its right to send the their accounts to a third-party debt collector and, if necessary, initiate legal remedies to collect payment.  *See* Exhibit G (September 19, 2019 email from Alexander Spong).

38.     Throughout October, November, and December of 2019, SGS repeatedly demanded outstanding payment on Defendants' significant arrearages but no payments were received.  The Defendants often acknowledged the significant arrearages they owed SGS but still refused to remit payment.

39.     Beginning in February 2019 and each moth thereafter up to an including December 2019, SGS invoiced the ERP Defendants for coal mine monitoring services it had performed.  The ERP Defendants kept the invoices for a reasonable period of time and did not object to the invoiced amounts.

40.      Beginning in April 2019 and each moth thereafter up to an including October 2019, SGS invoiced the Phoenix Federal Defendants for coal mine monitoring services it had performed.  The Phoenix Federal Defendants kept the invoices for a reasonable period of time and did not object to the invoiced amount.

41.     During SGS's business relationship with the ERP Defendants, SGS invoiced the ERP Defendants $5,408,652.49 for coal mine monitoring services.  Defendants have paid $4,661,532.45, leaving an unpaid balance of $747,120.04.

42.     Over the life of SGS's business relationship with the Phoenix Federal Defendants, SGS performed $209,414.74 in coal mine monitoring services for the Phoenix Federal Defendants.  SGS received four payments on the Phoenix Federal Defendants' account for a total of $110,566.12, leaving an outstanding balance of $98,848.62.  Notably, upon information and belief, all four payments came from Clarke Investments companies, including a credit card transaction with a VISA under the name "Thomas Clarke."

43.     To date, exclusive of interest, Defendants' outstanding invoices total $845,968.66 with the ERP Defendants' invoices totaling $747,120.04 and the Phoenix Federal Defendants' invoices totaling $98,848.62.

## COUNT I

### Breach of Contract – Against All Defendants

44.     Plaintiff SGS re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1-43.

45.     In or about October 2015, pursuant to ERP and Clarke Investments' specific requests via e-mail, SGS agreed to perform coal mine monitoring services for the ERP Defendants at certain locations SGS had previously performed coal mine monitoring services for Peabody Energy and Patriot Coal.

46.     In or about May 2018, pursuant to Phoenix Federal and Clarke Investments' specific requests, SGS agreed to perform coal mine monitoring services for the Phoenix Federal Defendants at certain locations at which SGS had previously performed coal mine monitoring services for ERP.

47.     As such, Defendants requested, and, SGS agreed, to perform coal mine monitoring services at certain of Defendants' coal mines in West Virginia in exchange for Defendants compensating SGS at an established, agreed upon, and stated rate for these services and in accordance with SGS's General Conditions of Service.

48.     Accordingly, SGS and the ERP Defendants entered into a binding and enforceable contract obligating SGS, on the one hand, to perform coal mine monitoring services at certain coal mines in West Virginia and obligating the ERP Defendants, on the other hand, to compensate SGS for the services performed.

49.     Similarly, SGS and the Phoenix Federal Defendants entered into a binding and enforceable contract obligating SGS, on the one hand, to perform coal mine monitoring services at certain coal mines in West Virginia and obligating the Phoenix Federal Defendants, on the other hand, to compensate SGS for the services performed.

50.     Pursuant to the contracts set forth above, SGS did, in fact, perform the coal mine monitoring services for Defendants in West Virginia from in or about November 2015 to December 2019 and from in or about May 2018 to October 2019 for the ERP Defendants and Phoenix Federal Defendants, respectively.

51.     SGS timely provided a series of invoices to Defendants for the coal mine monitoring services it had performed, which Defendants accepted without objection. Defendants, however, failed, as agreed, to pay SGS's invoices to the ERP Defendants dated February 2019 to December 2019 ("Subject ERP Defendant Invoices") and invoices to the Phoenix Federal Defendants dated April 2019 to October 2019 ("Subject Phoenix Federal Defendant Invoices").  Appended hereto are true and accurate copies at hereto as Exhibit H (Subject ERP Defendant Invoices) and Exhibit I (Subject Phoenix Federal Defendant Invoices).

52.     Each of the Subject ERP Defendant Invoices and each of the Subject Phoenix Federal Defendant Invoices contains a general description of the services performed, unit price of each service, the total amount invoiced, the payment term of thirty days, the payment due date, and also expressly incorporates SGS's General Conditions of Service, which, in relevant part, states as follows:

**4. FEES AND PAYMENT**

                    *       *       *       *       *       *       *       *       *

(b) Unless a shorter period is established in the invoice, Client will promptly pay not later than 30 days from the relevant invoice date or within such other period as may be established by the Company in the invoice (the "Due Date") all fees due to

the Company failing which interest will become due at a rate of 1.5% per month (or such other rate as may be established in the invoice) from the Due Date up to and including the date payment is actually received.

      *      *      *      *      *      *      *      *      *

(d) Company may elect to bring action for the collection of unpaid fees in any court having competent jurisdiction.

(e) Client shall pay all of the Company's collection costs, including attorney's fees and related costs.

53.      Further, SGS's and Defendants' conduct clearly show that each party intended to be bound by the contracts.  Defendants explicitly requested that SGS continue performing the coal mine monitoring services at the same locations and under the same terms that SGS had performed the services for Patriot Coal upon Defendants taking over the coal mine locations; SGS performed the coal mine monitoring services; SGS issued Defendants a series of invoices reflecting the services SGS had performed; and Defendants eventually paid SGS for the coal mine monitoring services reflected in invoices dated prior to the Subject ERP Defendant Invoices and the Subject Phoenix Federal Defendant Invoices.

54.      SGS fully performed all conditions, covenants, obligations, and promises under the above-referenced contracts in accordance with the terms thereof, and fully performed the agreed upon coal mine monitoring services.

55.      Defendants' failure to pay the Subject ERP Defendant Invoices and the Subject Phoenix Federal Defendant Invoices constitute material breaches of the corresponding above-referenced contracts, and triggers the accrual of 1.5% interest per month, each and every month up to the filing of this Complaint, on all the Subject ERP Defendant Invoices and the Subject Phoenix Federal Defendant Invoices since Defendants failed to pay any of the invoices by the specified due dates.  Summary of Subject ERP Defendant Invoices appended hereto as Exhibit J; Summary of Subject Phoenix Federal Defendant Invoices appended hereto as Exhibit K.

56.     Moreover, as a result of Defendants' wrongful conduct, SGS has been required to incur expenses, including retaining undersigned counsel to enforce its rights under the contracts, and will continue to incur expenses and attorneys' fees in enforcing its rights under the contracts. SGS will state the precise amount of the incurred expenses and attorneys' fees when known in accordance with proof, and such fees and costs are claimed against Defendants pursuant to the contracts herein alleged.

57.     As a direct and proximate consequence of Defendants' breach, inclusive of monthly interest accruing at 1.5% per month under the agreed terms, SGS has sustained damages of  $947,071.79 plus pre-judgement interest, together with attorneys' fees, late fees, and costs.

## COUNT II

### Quantum Meruit – Against All Defendants

58.     Plaintiff re-alleges and incorporates each and every allegation set forth in Paragraphs 1-57 above.

59.     SGS performed coal mine monitoring services for Defendants in West Virginia from in or about November 2015 to December 2019 for the ERP Defendants and from in or about May 2018 to October 2019 on behalf of the Phoenix Federal Defendants.

60.     SGS performed the coal mine monitoring services for each of the Defendants' benefit, and Defendants knew SGS was performing the coal mine monitoring services since Defendants asked SGS to perform same.

61.     Each of the Defendants accepted and benefitted from SGS's coal mine monitoring services because the services were, *inter alia*, necessary for Defendants to comply with their legal regulatory obligations.

62.     Further, each Defendant knew, or reasonably should have known, that SGS expected remuneration for the coal mine monitoring services.  Indeed, Defendants paid SGS for substantially similar coal mine monitoring services it had performed for the ERP Defendants prior to January 2019 and for the Phoenix Federal Defendants prior to March 2019.

63.     Defendants, however, have refused to compensate SGS for the coal mine monitoring services it performed as reflected in the Subject ERP Defendant Invoices and the Subject Phoenix Federal Defendant Invoices.

64.     Thus, SGS is entitled to the reasonable value of the uncompensated coal mine monitoring services it performed for Defendants, which totals $947,071.79 plus pre-judgement interest, together with attorneys' fees, late fees, and costs.

## COUNT III

### Unjust Enrichment – Against All Defendants

65.     Plaintiff re-alleges and incorporates each and every allegation set forth in paragraphs 1-64 above.

66.     As set forth above, Defendants have unjustly benefited from the uncompensated coal mine monitoring services SGS performed in or about January 2019 to December 2019 for the ERP Defendants and in or about March 2019 to October 2019 on behalf of the Phoenix Federal Defendants.

67.     SGS did not freely perform the referenced coal mine monitoring services, which Defendants knew or should have known, as evidenced by SGS's repeated demands for payment.

68.     Defendants have no legal justification for not paying for the coal mine monitoring services, as evidenced by Defendants' acknowledgment that they are indebted to SGS for the coal mine monitoring services.

14

69.     As a direct and proximate result of Defendants' deliberate failure of to compensate SGS for the full and reasonable value of the coal mine monitoring services, Defendants have been unjustly enriched and SGS has been correspondingly damaged in the total amount of $947,071.79 plus pre-judgement interest, together with attorneys' fees, late fees, and costs.

## COUNT IV

### Account Stated – Against All Defendants

70.     Plaintiff re-alleges and incorporates each and every allegation set forth in paragraphs 1-69 above.

71.     Pursuant to Defendants' explicit request, SGS performed coal mine monitoring services for which Defendants agreed to pay SGS.  SGS and each Defendant is a sophisticated corporate entity.

72.     SGS furnished invoices to Defendants that memorialized the coal mine monitoring services SGS had performed for Defendants.  True and accurate copies of the invoices are attached herein as the Subject ERP Defendant Invoices and the Subject Phoenix Federal Defendant Invoices.  *See* Exhibits H and I.

73.     On numerous occasions, SGS has demanded payment from Defendants but Defendants have failed to remunerate SGS.  A reasonable time has passed since SGS provided the invoices to Defendants and Defendants have not objected to the invoices.  Rather, Defendants have acknowledged that they are indebted to SGS for the amounts reflected in the invoices.

74.     Therefore, Defendants owe SGS $947,071.79 as reflected in the subject invoices plus pre-judgement interest, together with attorneys' fees, late fees, and costs.

15

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff SGS respectfully requests that this Court grant the following relief:

A.     A judgment in favor of SGS and against each Defendant on all Counts of this Complaint;

B.     Award SGS all monetary damages it has sustained as a result of Defendants' breach of contract, quantum meruit, unjust enrichment, and account stated pursuant to Counts I, II, III, and IV including without limitation an amount equal to $947,071.79 as documented in the Subject ERP Defendant Invoices and the Subject Phoenix Federal Defendant Invoices;

C.     Award SGS all costs and fees incurred in pursuing this debt, including attorneys' fees;

D.     Award SGS pre-judgment and post-judgment interest; and

E.     Grant such other and further relief as the Court deems just and proper.

Dated: March 24, 2020                    Respectfully submitted,

                                         SGS NORTH AMERICA, INC.,

                                         By Counsel,

                                          _/s/ Michael C. Cardi_
                                         Michael C. Cardi (WV Bar No. 12228)
                                         Kayla A. Cook  (WV Bar No. 11969)
                                         BOWLES RICE LLP
                                         125 Granville Square, Suite 400
                                         Morgantown, WV 26501
                                         (304) 285-2500
                                         mcardi@bowlesrice.com
                                         kcook@bowlesrice.com

                                              AND

16

Julius M. Redd (to be admitted PHV)
BEVERIDGE & DIAMOND, P.C.
1350 I Street, NW, Suite 700
Washington, DC 20005
(202) 789-6000
jredd@bdlaw.com

*Counsel for Plaintiff SGS North America, Inc.*